SHELDON F. KWIAT AND RITA KWIAT, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kwiat v. Commissioner
Docket Nos. 41301-86, 41302-86, 41305-86
United States Tax Court
T.C. Memo 1992-433; 1992 Tax Ct. Memo LEXIS 452; 64 T.C.M. (CCH) 327; July 29, 1992, Filed *452 Decision will be entered under Rule 155. Petitioners are the ostensible lessors of certain industrial shelving under an agreement whereby petitioners and the ostensible lessee exchanged reciprocal (but not simultaneous) puts and calls. Respondent has disallowed various deductions and determined additions to tax. 1. Held: The purported leasing transaction shifted the benefits and burdens of ownership of the industrial shelving and therefore constitutes a sale for tax purposes; accordingly, petitioners lack a depreciable interest in the industrial shelving. Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491. Held, further, lacking a depreciable interest, petitioners are not entitled to depreciation. Held, further, lacking a depreciable interest, petitioners are not entitled to the investment tax credit. Sec. 48(a)(1), I.R.C.
2. Held, further, petitioners' status is that of secured sellers, Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491, and the purported rent payments received by petitioners comprise both the purchase price of the industrial shelving and interest owing on unpaid principal *453 amounts. Held, further, the cost recovery method of Burnet v. Logan, 283 U.S. 404 (1931), is inappropriate; the installment rules of secs. 453 and 483, I.R.C., apply. 3. Held, further, respondent's disallowance of certain deductions claimed by petitioners is sustained in part. 4. Held, further, respondent's determinations of increased interest and additions to tax, under secs. 6621(c) and 6653(a), I.R.C., are not sustained. For Petitioners: Arnold Y. Kapiloff. For Respondent: George Soba. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Sheldon F. and Rita Kwiat
Increased Interest and
Additions to Tax
Year
Deficiency
Sec. 6621(c) [1]
Sec. 6653(a)
1980
$ 17,913
Interest on
--
$ 17,913
1981
6,077
Interest on
--
$ 6,007
1982
3,651
Interest on
--
$ 3,651
*454 Lowell M. and Fern Kwiat
Increased Interest and
Additions to Tax
Year
Deficiency
Sec. 6621(c)
Sec. 6653(a)
1980
$ 17,853
Interest on
--
$ 17,853
1981
6,139
Interest on
$ 307
$ 6,139
1982
3,351
Interest on
--
$ 3,351
David S. and Shirley R. Kwiat
Increased Interest and
Additions to Tax
Year
Deficiency
Sec. 6621(c)
Sec. 6653(a)
1980
$ 18,534
Interest on
$ 927
$ 18,534
1981
12,939
Interest on
--
$ 12,939
1982
3,651
Interest on
--
$ 3,651
Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: (1) Whether the purported lease by petitioners (and one other individual) of certain industrial shelving (pallet racking) to Standard Folding Cartons, Inc., constituted, for tax purposes, a sale, thereby depriving petitioners of any depreciable interest in, and rendering them ineligible for any depreciation deduction on account of, that pallet racking; (2) if the purported lease is, for tax purposes, a sale, whether petitioners are *455 entitled to some readjustment as a consequence of the proper restructuring of that transaction; (3) if petitioners do have a depreciable interest in the pallet racking, whether they properly applied the half-year convention for 1980 and the extent to which 1980 depreciation deductions must be adjusted because the racking was not fully installed at the end of 1980; (4) whether petitioners are entitled to an investment tax credit for 1980 or 1981; (5) whether petitioners (and one other individual, collectively) are entitled to interest expense deductions in excess of $ 30,641.05 for 1981 and $ 28,265.48 for 1982; (6) whether petitioners are entitled to various other deductions; and (7) whether petitioners are liable for increased interest and additions to tax. FINDINGS OF FACT Some facts have been stipulated and are so found. The stipulations of facts filed by the parties and accompanying exhibits are incorporated herein by this reference. At the time their respective petitions were filed, petitioners Sheldon F. Kwiat and Rita Kwiat resided in Great Neck, New York; petitioners Lowell M. Kwiat and Fern Kwiat resided in Muttontown, New York; and petitioners David S. Kwiat and Shirley *456 R. Kwiat resided in Tamarac, Florida. All petitioners elected the accrual method of accounting in reporting the transactions here described. Lowell M. Kwiat, David S. Kwiat, Sheldon F. Kwiat, and Jacques Roisen, Sheldon Kwiat's father-in-law (the Kwiat Group), are the ostensible lessors of the pallet racking and Standard Folding Cartons, Inc. (Standard), is the ostensible lessee. Standard is a domestic corporation, doing business in Jackson Heights, New York City, which manufactures printed paperboard packaging. In 1980, Standard had a need for additional shelving in its Maspeth, New York, warehouse for storing paperboard packaging prior to shipment. In 1980, Steven Levkoff (Levkoff) was the vice president of Standard. In the summer of 1980, Levkoff began investigating various ways of financing the acquisition of industrial shelving for the Maspeth warehouse. In 1980, Levkoff discussed Standard's need for shelving with his friend Lowell Kwiat. Standard required a method of financing that would not consume its line of credit or otherwise affect its borrowing capacity. Levkoff and Lowell Kwiat discussed the possibility of Kwiat Capital Corp. (Kwiat Capital), a small business *457 investment company then in the process of formation, financing the acquisition of the shelves. Kwiat Capital was not yet licensed, however, and the Kwiat Group engaged in the property transactions here in question as cotenants. In 1980, the Kwiats principally were engaged in the business of importing, manufacturing, and selling diamonds. Prior to 1980, the Kwiats also had invested in several other businesses, and, in connection with the formation of Kwiat Capital, were investigating various leasing transactions. Kwiat and Levkoff negotiated the terms and conditions of the transaction between the Kwiat Group and Standard. Leon C. Baker, Esq. (Baker), represented the Kwiat Group. His activities were limited to legal drafting and legal advice; the conception, negotiation, and administration of the transaction were the work of Lowell Kwiat. The 1980 Transaction
The original transaction between the Kwiat Group and Standard (the 1980 Transaction) comprised three agreements which were captioned "Agreement of Lease" (the 1980 Lease), "Put Agreement" (the 1980 Put), and "Call Agreement" (the 1980 Call). The 1980 Lease
The 1980 Lease was for a stated term of 4 years and *458 11 months, from December 12, 1980, through November 11, 1985. Thereunder, Standard was obligated to make payments to the Kwiat Group on the 12th of each month, commencing December 12, 1980, and ending October 12, 1985. Each monthly payment was to be $ 5,315, except that if the prime interest rate of European American Bank and Trust Co. (EAB) exceeded 16 percent, each monthly payment would be increased by $ 55 for each quarter percent above 16 percent. Similarly, if the prime interest rate of EAB fell below 16 percent, each monthly payment would be decreased by $ 55 for each quarter percent below 16 percent. Under the terms of the 1980 Lease, Standard had the option of providing the Kwiat Group with a commitment from a lender to finance the balance of the Kwiat Group's unamortized investment in the pallet racking (based on a cost of $ 359,799 and a 13 percent per annum rate of return on unrecovered investment) at a fixed rate of interest, but otherwise on the same terms as the Kwiat Group's then-current financing. If Standard were to deliver such a commitment to the Kwiat Group, then, effective as of the date when such financing would become available under the commitment, the *459 adjustment would be constant for the balance of the lease term and would be computed as if the rate provided for in the commitment were the prime interest rate of EAB. The 1980 Lease required Standard to pay to the Kwiat Group all sales, use, property, or other taxes, licenses or other fees which might become payable on sums being paid by Standard to the Kwiat Group, on the use, lease, operation, control, or value of the pallet racking, as well as any costs incurred by the Kwiat Group in curing any default by Standard. Standard was to be held responsible for all costs and expenses relating to the pallet racking. Standard was required to maintain and repair the pallet racking at its own cost and expense. The risk of loss or damage to the pallet racking was on Standard and Standard was to maintain insurance against any loss or damage to the pallet racking and provide any additional funds required for repair or replacement. Standard was required to hold the Kwiat Group harmless and to indemnify them against any and all claims related to the pallet racking during the term of the 1980 Lease. Standard also was required to protect, at its own cost, the Kwiat Group's interest in the *460 pallet racking against any claims, liens, charges, encumbrances, or legal processes of Standard's creditors. Standard could sell, assign, transfer, encumber, or hypothecate its interest in the pallet racking, with the consent of the Kwiat Group, which could not unreasonably be withheld or delayed. Any such sale, assignment, transfer, encumbrance, or hypothecation would not relieve Standard of its obligations under the 1980 Lease. Standard was to receive the benefit of all manufacturer's warranties on the pallet racking. At the conclusion of the 1980 Lease, Standard was to return the pallet racking to the Kwiat Group (in New York City) in the same condition as when received, reasonable wear and tear excepted. The 1980 Put
The 1980 Put granted the Kwiat Group the right to force Standard to purchase the Kwiat Group's interest in the pallet racking for $ 238,910. The 1980 Put could be exercised by the Kwiat Group between October 13, 1985, and December 31, 1986. The 1980 Put could be exercised only if the parties to the 1980 Lease failed to extend or renew that lease. The 1980 Put never was exercised and has expired. The 1980 Call
The 1980 Call granted Standard the option *461 to purchase the Kwiat Group's interest in the pallet racking for $ 159,452. Standard could pay that amount in one lump-sum, or it could make installment payments. If it chose the latter, it was obligated to pay 36 monthly installments of $ 5,315, each installment (after the first) including interest at 13 percent per annum. [2] The 1980 Call could be exercised by Standard between November 13, 1987, and December 31, 1987. The 1980 Call never was exercised and has expired. The 1983 Transaction
On April 1, 1983, Standard and the Kwiat Group extended the 1980 Lease and otherwise modified the 1980 Transaction. That transaction (the 1983 Transaction) comprised four documents, *462 captioned "Agreement of Lease" (the 1983 Lease); "Put Agreement" (the 1983 Put); "Call Agreement" (the 1983 Call); and "Agreement to Extend Lease" (the 1983 Agreement to Extend). The 1983 Lease
Under the terms of the 1983 Lease, the lease term was extended to run from January 1, 1981, until December 31, 1990. The monthly payments no longer were to be tied to the EAB prime interest rate, but were to remain constant at $ 6,450.56 a month, and were to be payable from April 1, 1983, through December 1, 1990. Except for those modifications, the 1983 Lease was identical to the 1980 Lease. The 1983 Put and Call
As part of the 1983 Transaction, the Kwiat Group and Standard executed the 1983 Put and the 1983 Call. The 1983 Put permitted the Kwiat Group to force Standard to purchase the Kwiat Group's interest in the pallet racking for $ 120,578. The 1983 Put was exercisable by the Kwiat Group between March 3, 1989, and December 31, 1989. The 1983 Call granted Standard the right to purchase the Kwiat's Group's interest in the pallet racking for $ 178,173. The 1983 Call was exercisable by Standard between March 3, 1988, and December 31, 1988. The 1983 Put and Call never were *463 exercised and have expired. The 1991 Agreement
By an agreement dated January 1, 1991, and captioned "Agreement to Extend Lease" (the 1991 Agreement), Standard and the Kwiat Group extended and modified their transaction. The 1991 Agreement extended the term of the transaction through August 31, 1992, and reduced the monthly payments to $ 5,000 per month. All other terms of the 1980 Lease, as modified by the 1983 Lease, remained the same. The 1991 Agreement did not include the execution of any new puts or calls. The 1991 Agreement was prepared after petitioners became aware of the potential significance of the prior puts and calls to this case. The Pallet Racking
The equipment involved in the transaction at issue was warehouse pallet racking, which consisted of 20-foot-high welded uprights, anchored to a concrete floor with over 2,500, 4.25- by 0.625-inch bolts, which had to be inserted in holes made with an impact drill. The pallet racking weighed in excess of 620,000 pounds. It was shipped by Warehouse Storage Systems Co. (Warehouse Storage) to Standard in approximately 15 flatbed tractor-trailer truckloads between November 20, 1980, and December 9, 1980. *464 About one-third of the truckloads was shipped to Standard in November 1980. Initially, Warehouse Storage failed to ship 2,000 "hi-bolts", which were shipped no earlier than January 23, 1981. The 2,000 hi-bolts constituted 10 percent of the total hi-bolts necessary for the complete installation of the pallet racking. No more than 60 percent of the pallet racking had been installed by the end of December 1980. The labor that would be required to remove the pallet racking is only slightly less than the labor that was required to install it. The equipment necessary for that task would include forklifts and impact wrenches. No member of the Kwiat Group is an expert regarding the various technical matters respecting the complexity, weight, or installation of the pallet racking, and none had any knowledge of pallet racking beyond what they were told by Levkoff. The Kwiat Group entered into no contracts and executed no purchase orders for the purchase or installation of pallet racking. The price of the pallet racking, for which price Warehouse Storage included a 1 - year written warranty, was $ 290,646.52. The Kwiat Group provided the funds used to purchase the pallet racking from *465 Warehouse Storage. The cost of installing the pallet racking was $ 51,679.89, which was paid by the Kwiat Group. The cost of taking down, moving, and reinstalling an existing rack, in order to make room for the new pallet racking, was $ 6,795, which was paid by the Kwiat Group. The installation of the pallet racking, including the taking down, moving, and reinstallation of the existing rack, was subject to sales tax of $ 4,677.99, which was paid by the Kwiat Group. The Kwiat Group paid legal fees and expenses with regard to this transaction of $ 4,141.32. The cost of shipping the pallet racking to Standard's warehouse was $ 6,758.01, $ 6,000 of which cost was provided by the Kwiat Group. The total cost to the Kwiat Group of purchasing and installing the pallet racking (including sales tax, legal fees, etc.) was $ 363,940.72. The Kwiat Group obtained virtually all of the funds to invest in this transaction from: (1) $ 20,000 cash contributions from each of the four members ($ 80,000); (2) a $ 273,000 loan from EAB; and (3) the first 2 monthly payments required under the 1980 Lease ($ 10,630). Petitioners depreciated their claimed bases in the pallet racking under the Class *466 Life Asset Depreciation Range (ADR) System set forth in section 1.167(a)-11, Income Tax Regs. On their income tax returns for each of the years in question, petitioners elected the half-year convention under the ADR System, and used the 200-percent declining balance depreciation method. Petitioners elected an 8-year useful life in depreciating the pallet racking. Petitioners took a full half-year's depreciation on the pallet racking in 1980. In 1980, each pair of petitioner spouses (hereinafter referred to, in the singular, as petitioner) took additional first year depreciation of $ 4,000 under section 179. Each petitioner deducted $ 900 of the legal fees and expenses for 1980 with regard to the transaction at issue. Each petitioner treated the balance of the legal fees and expenses as "Organization Expenses" on the 1980 tax return, amortizing them over 5 years, on a straight line basis. The Warranty
The manufacturer of the pallet racking, Warehouse Storage, initially submitted an invoice to Standard for the pallet racking. However, a subsequent invoice indicates that the Kwiat Group was the purchaser of such pallet racking. The first invoice issued by Warehouse Storage, *467 to Standard, did not specify a price for the included, unwritten warranty. Subsequent to shipping the pallet racking and issuing an invoice to Standard, Warehouse Storage was asked (it is not clear by whom) to prepare a new invoice for the pallet racking, to be addressed to the Kwiat Group. Warehouse Storage also was asked, and agreed, to break down the price of the pallet racking to reflect an allocation between the cost of the pallet racking and the cost of the 1-year warranty (which was to be provided in writing). Of the total invoice price, $ 12,000 was allocated to the cost of the 1-year warranty. The request for an invoice made out to the Kwiat Group, separately stating the cost of the warranty, was initiated by Lowell Kwiat. Warehouse Storage always provided a 1-year warranty on all of its pallet racking, without charging a separately stated price therefor. Interest Expense
On January 12, 1981, the Kwiat Group borrowed $ 273,000 from EAB to finance their interest in the pallet racking (the $ 273,000 loan). On their income tax returns, each petitioner claimed, as an interest expense, $ 12,993 (one-fourth of $ 51,972) in 1981 and $ 9,951 (one-fourth of $ 39,804) *468 in 1982. Petitioners and respondent are in agreement (and we find) that the Kwiat Group paid interest totaling no less than $ 30,510.28 to EAB in 1981 on the $ 273,000 loan, as reflected in the table below: BILL DATE
AMOUNT
MEMORANDUM
THRU/POSTED
03-24-81
$  3,185.00
Int. Pay
02-26-81
03-24-81
4,337.67
Int. Pay
03-19-81
04-24-81
4,388.22
Int. Pay
04-06-81
05-22-81
4,089.90
Int. Pay
05-07-81
06-24-81
3,278.51
Int. Pay
06-09-81
07-24-81
2,054.01
Int. Pay
07-20-81
08-24-81
2,129.98
Int. Pay
08-14-81
09-24-81
2,085.90
Int. Pay
09-17-81
12-24-81
4,961.09
Int. Pay
12-23-81
Total
$ 30,510.28
Petitioners and respondent also are in agreement (and we find) that the Kwiat Group paid interest totaling no less than $ 28,167.08 to EAB in 1982 on the $ 273,000 loan, as reflected in the table below: BILL DATE
AMOUNT
MEMORANDUM
THRU/POSTED
03-31-82
$ 3,371.27
Int. Pay
03-01-82
04-30-82
3,630.79
Int. Pay
04-01-82
05-05-82
3,524.48
Int. Pay
05-03-82
06-30-82
3,254.44
Int. Pay
06-01-82
07-30-82
3,318.67
Int. Pay
07-01-82
08-30-82
3,392.93
Int. Pay
08-02-82
11-30-82
5,523.62
Int. Pay
11-01-82
12-31-82
2,150.88
Int. Pay
12-01-82
Total
$ 28,167.08
*469 Petitioners and respondent also are in agreement (and we find) that the Kwiat Group paid overdraft interest charges totaling $ 130.77 to EAB in 1981, as reflected in the table below: POSTING DATE
REFERENCE
TRANSACTION DESCRIPTION
AMOUNT
02-18-81
08060361
Overdraft Interest
$   15.14
05-19-81
08060312
Overdraft Interest
4.97
06-17-81
08060269
Overdraft Interest
7.38
07-16-81
08060348
Overdraft Interest
5.92
11-16-81
08060404
Overdraft Interest
48.68
12-16-81
08060368
Overdraft Interest
48.68
Total interest overdraft charges in 1981:
$ 130.77
Petitioners and respondent also are in agreement (and we find) that the Kwiat Group paid overdraft interest charges totaling $ 98.40 to EAB in 1982, as reflected in the table below: POSTING DATE
REFERENCE
TRANSACTION DESCRIPTION
AMOUNT
01-18-82
08060409
Overdraft Interest
$ 15.75
02-16-82
08060343
Overdraft Interest
56.25
04-19-81
08060457
Overdraft Interest
13.98
05-17-81
08060347
Overdraft Interest
9.90
07-16-82
08060325
Overdraft Interest
2.52
Total interest overdraft charges in 1982:
$ 98.40
Certain "ledger pages" of the Kwiat Group indicate a $ 162,976.68 payment, there identified *470 as "#24 - KCC 150M & INT". The October 1981 statement of a checking account, in the name of Lowell Kwiat, at EAB indicates a debit of $ 162,976.68 on October 9, 1981. The May 1981 EAB loan statement and the May 1981 statement of a checking account, in the name of Lowell Kwiat, at EAB indicate a $ 150,000 reduction in the principal balance of the $ 273,000 loan, as of May 19, 1981. The December 1981 EAB loan statement indicates that $ 30,510.28 in interest and fees was paid on the $ 273,000 loan during 1981. The final EAB loan statements for 1981 and 1982 indicate unpaid interest charges of $ 1,301.31 and $ 7,145.21 (totaling $ 8,446.52) and $ 7,145.21 for 1981 and $ 2,254.45 for 1982. Respondent's notice of deficiency in each case here consolidated was issued in September 1986. OPINION I. A Depreciable Interest
The threshold question is whether petitioners, during the taxable years here at issue, had any depreciable interest in the pallet racking and, therefore, potentially are entitled to any depreciation deductions for those years. That will depend upon whether the transaction between the Kwiat Group and Standard is to be treated as a lease or as a sale (or loan) *471 [3] for tax purposes. Indeed, that transaction, at least in part, resembles a conventional equipment lease. The 1980 Lease, in consideration for fixed, periodic payments, accords to Standard the use of property (the pallet racking) for a limited period. It is true that the 1980 Lease may be described as a "net lease", in that, during the term of Standard's possession, it is to maintain the property, insure it, and pay all costs, expenses, fees, and charges incurred in connection therewith and with its use of the property. The status of a lessor as a true lessor does not necessarily suffer, however, because, under a net lease certain operating costs are transferred to the lessor. See Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491. Nevertheless, it is insufficient that a transaction in part resemble a lease. A transaction described by the parties thereto as a lease will be treated as such for tax purposes only if the purported lessor retains significant and genuine attributes of the traditional lessor status. Frank Lyon Co. v. United States, supra at 584. *472 "However, if the benefits, obligations, and rights of the putative lessor are essentially those of a secured seller, the substance of the arrangement must govern and it will be deemed a sale for tax purposes." Aderholt Specialty Co. v. Commissioner, supra (citations omitted); see Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837, 841 (1978) (considering whether the transaction "shifted the burdens and benefits of full ownership"). Accordingly, the pertinent inquiry is whether the purported lessor maintained the risk of economic depreciation and the benefit of appreciation at the end of the lease term. Aderholt Specialty Co. v. Commissioner, supra.
Respondent argues that *473 the 1980 Lease should be read together with the 1980 Put and the 1980 Call and that the 1980 Transaction, as a whole, left petitioners without the benefits and burdens of ownership and, consequently, with no depreciable interest in the pallet racking. [4] Under the terms of the 1980 Put, which was exercisable between October 13, 1985, and December 31, 1986, the Kwiat Group could require Standard to purchase the pallet racking for $ 238,910. Thus, petitioners were insulated from the risk that the pallet racking would depreciate in value below that point before December 31, 1986. Under the terms of the 1980 Call, which was exercisable between November 13, 1987, and December 31, 1987, Standard could require the Kwiat Group to sell it the pallet racking for $ 159,452. Thus, petitioners would not benefit from any appreciation (or unexpectedly low economic depreciation) occurring before the end of 1987. From that analysis, respondent argues that, to a substantial degree, the benefits and burdens of ownership rested with Standard and not with petitioners. [5]
*474 Petitioners do not directly argue that they possessed the benefits and burdens of ownership, but point out that this Court already has considered whether reciprocal puts and calls transform a lease into a sale, and has held that they do not. Penn-Dixie Steel Corp. v. Commissioner, supra at 845. In Penn-Dixie Steel Corp., as here, the put could only be exercised for a limited time and the call could first be exercised less than 1 year after the end of that period. [6] The ostensible lessee argued that the transaction was a purchase for tax purposes. We rejected that notion: In short, the put and call arrangement did not legally, or as a practical matter, impose mutual obligations on * * * [lessor] to sell and on * * * [lessee] to buy. To be sure, neither party could unilaterally withdraw and prevent a sale, but each party's obligation to act was contingent upon exercise of the put or call, an event which might well fail to occur. [Id. at 844-845; citations omitted.] *475 Penn-Dixie Steel Corp., however, is distinguishable from this case. In Penn-Dixie Steel Corp., we concluded that the nonsimultaneous options there at issue did not, as a practical matter, impose mutual and complementary obligations to buy and sell. The nature of the property there subject to reciprocal options was a new corporation, formed pursuant to a joint venture agreement between its two shareholders. That joint venture agreement was signed more than 3 years before the expiration of the put and more than 4 years before the expiration of the call. Anticipating the value of the new business to be quite changeable, we considered it more than a remote possibility that both options would go unexercised. Here, the nature of the option property is different, less subject to volatile changes in value, as is the position and obligation of the parties in relationship thereto (e.g., Standard bears the risk of loss during the lease term). Petitioners misread Penn-Dixie Steel Corp. if they think that this Court there held that the existence of nonsimultaneous options precludes a conclusion of mutuality or a finding that a sale has occurred. In Penn-Dixie Steel Corp. *476 it was the taxpayer, a party to the transaction there at issue, who argued that reciprocal puts and calls constituted a sale for tax purposes. Accordingly, this Court considered it appropriate to "proceed with caution and seek strong proof from the party to the transaction who asks us to accede to blandishments that its form be ignored." Id. at 842 (fn. ref. omitted). We did not find such strong proof and, thus, did not sustain the taxpayer. On the basis of the taxpayer's failure of proof in Penn-Dixie Steel Corp., it would be a mistake to conclude how we would have found had the measure of persuasion been different. Thus, it would be a mistake to conclude that the taxpayer in Penn-Dixie Steel Corp. would (or would not) have prevailed had the measure of persuasion been only a preponderance of the evidence (as opposed to "strong proof"). Likewise, it would be a mistake to conclude on the basis of Penn-Dixie Steel Corp. (whatever the measure of persuasion) how we would find, given a taxpayer in a similar economic situation, with the same evidence in issue, but arguing against characterization as a sale. With regard to Penn-Dixie Steel Corp. *477 , all that can be said is that reciprocal puts and calls are not necessarily sufficient to demonstrate by "strong proof" that a sale for tax purposes has occurred. Of course, petitioners here are arguing something quite different. Petitioners here bear the burden of proof, Rule 142(a), which they must carry by a preponderance of the evidence. UFE, Inc. v. Commissioner, 92 T.C. 1314, 1321 (1989). We think that, whether a taxpayer is arguing for or against characterization of an ostensible lease as a sale, and whether the required measure of persuasion is strong proof or a preponderance of the evidence, the mere possibility that neither the put nor the call will be exercised should not be determinative that a sale has not occurred. For the issue is not whether a commercial sale ultimately will be completed, but whether the transaction, as it stands at the time in question, sufficiently shifts the benefits and burdens of ownership such that the transaction should, for tax purposes, be treated as if it were a sale. The mere presence of reciprocal puts and calls, exercisable within relatively close time periods, undoubtedly shifts substantial benefits and burdens *478 of ownership. [7] Because of the put, the burden of any economic depreciation of the pallet racking occurring before December 31, 1986, would not fall upon petitioners. Similarly, because of the call, the benefit of any appreciation (or unexpectedly low economic depreciation) occurring before December 31, 1987, would benefit Standard, and not petitioners. Those benefits and burdens shift even if a sale is never "consummated". [8]
Petitioners argue that because the 1980 Put and Call neither were mandatory nor *479 ultimately were exercised, those agreements are an insufficient basis for recharacterizing the 1980 Lease as a sale. We believe the ultimate nonexercise of the 1980 Put and Call to be inapposite. The existence of the reciprocal put and call on these facts is sufficient to shift the benefits and burdens of ownership; their ultimate nonexercise is irrelevant. Moreover, here, before either the 1980 Put or the 1980 Call became exercisable, the 1980 Lease was extended by the 1983 Lease and alternative puts and calls, the 1983 Put and the 1983 Call, were negotiated; before those puts and calls became exercisable, the notices of deficiency giving rise to these cases were issued, and the 1983 Lease was extended (by the 1991 Agreement). Given the prior commencement of respondent's examination, we find the nonexercise of the 1983 Put and Call unsurprising. Petitioners also argue that it is unrealistic to view the transaction between the Kwiat Group and Standard as a deferred payment sale or loan because the effective annual rate of interest inherent therein would be 16.650 percent, an interest rate that, petitioners assert, is well in excess of the available cost of money. [9] While *480 that may now be the case, respondent answers, 16.650 percent certainly was not in excess of the cost of money in 1980. To support that assertion, respondent cites Lowell Kwiat's testimony at trial that the Prime Rate was "in the neighborhood of 20 percent" in late 1980 and early 1981. Petitioners have provided no evidence to the contrary. Accordingly, petitioners have failed to demonstrate that a 16.650-percent interest rate would be unrealistically high if the transaction at issue were viewed as a deferred payment sale or loan. Rule 142(a). Petitioners also argue that, after making 10 years of payments to the Kwiat Group, Standard still does not own the pallet racking in question. Petitioners point out that each month the Kwiat Group receives $ 5,000 from Standard, pursuant to the 1991 Agreement (which does not involve puts or calls), which payments, petitioners argue, are entirely inconsistent with the transaction at *481 issue being a sale or loan. We answer only that we interpret the 1980 Transaction as of the time it was entered into (including, perhaps, some consideration of how the parties thereto have honored that agreement). That the Kwiat Group and Standard subsequently renegotiated their agreement, and that Standard apparently has made payments in accordance therewith, are quite beside the point (and, given the commencement of respondent's examination, not at all surprising). Conclusion
Considering the 1980 Transaction as a whole, including the reciprocal put and call, we conclude that it was a remote possibility in 1980 that both the 1983 Put and Call would go unexercised. Therefore, the 1980 Transaction substantially shifted the benefits and burdens of ownership of the pallet racking from petitioners (and Jacques Roisen) to Standard and constitutes a sale for tax purposes. Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491. Petitioners' status, for tax purposes, is that of secured sellers. [10]Id.; see Frank Lyon Co. v. United States, 435 U.S. 561, 584 (1978). Petitioners therefore lack a depreciable interest in the pallet racking *482 and are not entitled to any depreciation deductions with respect thereto for the tax years at issue. Having reached that conclusion, we find it unnecessary to consider whether petitioners correctly computed the depreciation deduction to which they would have been entitled, had they had a depreciable interest during the taxable years here at issue. II. Recharacterizing the "Rent" Payments
A. Cost Recovery Reporting *483 Method
Petitioners contend that the transaction at issue, if a loan (sale), is "open" and contingent and therefore triggers the doctrine of Burnet v. Logan, 283 U.S. 404 (1931). [11] Under that doctrine, petitioners argue, all payments received by petitioners must first be applied to return to them their capital investment and, only after all capital has been recovered, then would the payments constitute income. [12] Petitioners' reliance on Burnet v. Logan, supra, is misplaced. In Burnet v. Logan, supra, the (predecessor of the) taxpayer sold stock in a company for: (1) A fixed sum of cash, and (2) future payments of $ 0.60 per ton of iron ore thereafter extracted from a certain mine. The Supreme Court, faced with the problem of allocating interest and principal, where the purchase price of the stock was exceedingly far from clear, stated: The consideration for the sale was $ 2,200,000.00 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had *484 no ascertainable fair market value. The transaction was not a closed one. * * * [the taxpayer] might never recoup her capital investment from payments only conditionally promised. Prior to 1921 all receipts from the sale of her shares amounted to less than their value on March 1, 1913. She properly demanded the return of her capital investment before assessment of any taxable profit based on conjecture. [Id. at 413; emphasis added.] The circumstances in Burnet v. Logan, supra, were: (1) The impossibility of ascertaining the purchase price "with anything like fair certainty", and (2) the possibility that the taxpayer might never completely recover her capital investment. Id. Neither of those circumstances is present in this case. Here, the purchase price of the pallet racking can fairly be determined in at least two ways: First, we might suppose that the price at which the Kwiat Group bought the racking from Warehouse Storage (including installation, legal fees, etc.) fairly approximates the price at which the Kwiat Group sold the racking to Standard (Standard being able to purchase such racking (and indeed having contracted *485 to purchase it) at the price paid by the Kwiat Group), United States v. Davis, 370 U.S. 65, 72 (1962); second, we might consider the purchase price to be the discounted value of: (1) The "rent" payments due under the 1980 "lease" (until the exercise of either the put or the call), and (2) the $ 238,910 put payment, to which the Kwiat Group, if it so chose, was entitled. Further, there was never any nonnegligible possibility that petitioners would fail to recoup their capital investment: the Kwiat Group was armed with an absolute right to receive monthly rent payments (of approximately $ 5,315) for 4 years and 11 months and then "put" the pallet racking to Standard for $ 238,910 on October 13, 1985, which payments would more than recover the Kwiat Group's $ 363,940.72 investment. Accordingly, Burnet v. Logan is here inapposite. *486 B. Installment Sale/Rule 155 Computation
Having determined that the "lease" of the pallet racking was, for tax purposes, a sale, we must consider the tax consequences of the "rent" payments received by petitioners during the tax years at issue. Inasmuch as the purchase price of the pallet racking was not paid immediately, but was paid over time, it follows that some portion of the "rent" payments must be interest owing on the unpaid principal. An additional portion may constitute gain, within the meaning of section 1001(a). Given our resolution of the remainder of petitioners' arguments, the calculation of any gain on the sale and the necessary interest allocation may involve merely computations to be made under the rules of sections 453 and 483. We will thus assign those calculations to the parties to be made pursuant to the Rule 155 computation. III. Investment Tax Credit
Petitioners claim that respondent improperly denied their investment tax credit, which they claimed under sections 38 and 46. Respondent sets forth three grounds upon which, she contends, petitioners' investment tax credit properly was denied. Those grounds are: (1) Petitioners lacked a depreciable *487 interest in the pallet racking, as required by section 48(a)(1); (2) for the period consisting of the first 12 months after the date on which the pallet racking was transferred to Standard, the sum of the deductions relating thereto, allowable solely by reason of section 162 (other than rents and reimbursed amounts), did not exceed 15 percent of the rental income, as required by section 46(e)(3)(B); and (3) the term of the purported lease (taking into account options to renew) was more than 50 percent of the useful life of the pallet racking for the purposes of section 46(e)(3)(B). We agree with respondent's first argument. The investment tax credit is only available for property with respect to which depreciation is allowable. Sec. 48(a)(1). Because petitioners had no depreciable interest in the pallet racking during the taxable years here at issue, they are not entitled to an investment tax credit for those years. Id. We sustain respondent's denial of the investment tax credit for that reason and therefore find it unnecessary to address her other arguments. IV. Interest Expense Deduction
First, petitioners argue that respondent improperly has refused to make any *488 allowance for missing bank statements and that respondent has offered no evidence that the interest deducted on petitioners' income tax returns was not charged by EAB and paid by petitioners. Petitioners' argument misses the mark. The burden is upon petitioners to demonstrate that they incurred the interest expenses for which they seek deductions on their income tax returns; if petitioners fail to sustain that burden, respondent will prevail, even if she does nothing. Rule 142(a). The EAB financing was in the nature of a line of credit, such that the balance to EAB outstanding could vary on a day-to-day basis, as amounts were received and repayments made. We will not infer a day-to-day balance; petitioners must bear the burden of unavailable evidence. Second, petitioners argue that respondent improperly has failed to acknowledge an interest payment of $ 12,976.68, which payment supposedly was made on October 9, 1981, to Kwiat Capital. Petitioners direct our attention to: (1) Certain "ledger pages" of the Kwiat Group, indicating a $ 162,976.68 payment there identified as "#24 - KCC 150M & INT"; (2) the October statement of a checking account, in the name of Lowell Kwiat, at *489 EAB, indicating a $ 162,976.68 debit on October 9, 1981; and (3) an EAB loan statement and checking account statement, dated May 1981, indicating a $ 150,000 reduction in principal balance, as of May 19, 1981. Accordingly, petitioners argue that $ 12,976.68 of the $ 162,976.68 payment (the portion not applied to reduce the principal balance) must be interest paid to Kwiat Capital. The evidence adduced by petitioners is insufficient to support their argument. There is no direct testimony or any substantiation of any interest-bearing indebtedness to Kwiat Capital. Thus, even accepting, arguendo, that $ 162,976.68 was in fact paid by the Kwiat Group to Kwiat Capital, petitioners have failed to demonstrate that any portion of that payment constituted interest on indebtedness to Kwiat Capital. Third, petitioners argue that, because petitioners were on the accrual method of accounting for the taxable years at issue, proper account must be taken of interest charges incurred, but not yet paid, in those years. Accordingly, petitioners argue that they are entitled to deduct interest charges of $ 1,301.31 and $ 7,145.21, incurred (though not paid) in 1981 and $ 2,254.45 incurred (though *490 not paid) in 1982. In support of those assertions, petitioners direct our attention to EAB loan statements indicating unpaid interest charges in the amounts described above. We agree with petitioners in that respect and find that the Kwiat Group incurred interest expenses of $ 39,087.57 in 1981 and $ 30,519.93 in 1982. Accordingly, each petitioner may deduct, as interest expenses, one-fourth of those figures for 1981 and 1982, respectively. V. Other Deductions
A. Warranty Expenses
Petitioners argue that they are entitled to deduct (their fair share of) a $ 12,000 warranty expense. Respondent argues that that expense is fictitious, and that petitioners incurred no costs with regard to the warranty, for which Warehouse Storage never charged a separate fee. We cannot agree with respondent. In an arm's-length transaction, such as that between the Kwiat Group and Warehouse Storage, it is unlikely that one party would gratuitously bestow a benefit upon the other. Instead, we find that the price of the 1-year warranty is included in Warehouse Storage's regular price structure. As for the specific portion of the purchase price allocable to the warranty, petitioners *491 have produced an invoice prepared by Warehouse Storage which we accept as that company's cost of the 1-year warranty. Respondent has not contested that figure beyond arguing that no allocation whatsoever would be appropriate. Accordingly, we accept the $ 12,000 figure as correct. Nevertheless, we will not accord petitioners a deduction in that amount. Pursuant to the 1980 Transaction, which we have recharacterized as a sale, the Kwiat Group transferred to Standard (for consideration) its interest in the pallet racking, as well as the benefit of the warranty, at virtually the same time it obtained ownership from Warehouse Storage. Thus, the cost of the warranty was immediately recouped and no expense, as a practical matter, was incurred. We therefore conclude that respondent properly disallowed the warranty expense. [13]
*492 B. Legal Expenses
Petitioners contend that the legal services performed by Baker for the Kwiat Group in connection with the "lease" of the pallet racking to Standard were ordinary and necessary business expenses deductible under section 162 or, in the alternative, section 212. Baker did not testify. Petitioners have proposed as findings of fact that his activities were limited to legal drafting and legal advice and that the conception, negotiation, and administration of the transaction were the work of Lowell Kwiat. Respondent has not objected to that proposed finding, and we have so found. Baker's bill, for $ 4,141.32, is in evidence and we have examined it. Indeed, it describes his initial meeting with two members of the Kwiat Group to discuss a "sale-leaseback of shelving with set up box manufacturer", further conferences, his drafting of the lease, the making of revisions and modifications, discussions of the put and call arrangements, and, finally, arrangements for signature of the agreements. All in all, over 25 separate activities are mentioned. It is clear to us that those activities relate to the acquisition and disposition by the Kwiat Group of the pallet racking. *493 Tax consequences are mentioned once, in reference to a conversation with another attorney concerning certain changes to the proposed transaction. We have said: It is well established that fees paid in connection with the acquisition or disposition of real or personal property (such as legal, accounting, and brokerage fees) ordinarily are capital expenditures which are either to be added to cost or offset against selling price in determining the gain or loss upon the ultimate disposition of the property. [Gunn v. Commissioner, 49 T.C. 38, 52 (1967); citations omitted.] Nevertheless, section 212(3) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year "in connection with the determination, collection, or refund of any tax." We have allowed a deduction for an accountant's services to minimize income taxes in connection with the purchase of a building, and have disallowed an attorney's services in connection with the same transaction, which services were to see that the transaction documents accomplished a legal acquisition. Collins v. Commissioner, 54 T.C. 1656, 1665-1666 (1970). While *494 it is clear to us that tax avoidance was a significant purpose of the 1980 Transaction, petitioners have not shown that Baker had any significant responsibility for tax advice. Petitioner's proposed findings of fact cast Baker primarily as a scrivener, engaged also to insure that Lowell Kwiat's conception passed legal muster. We conclude that 4 percent of Baker's bill was for tax advice, and thus allow a deduction under section 212(3) in the amount of $ 165. C. Sales Tax
Section 164(a)(4) permits the deduction of State and local general sales taxes. It is not enough, however, that the tax be paid by the taxpayer; that tax must be imposed upon the taxpayer by State law. Maack v. Commissioner, T.C. Memo. 1983-37. Accordingly, petitioners' entitlement to a deduction for sales tax under section 164(a)(4) turns upon the question of whether New York State law imposes the sales tax upon the purchaser. If so, then petitioners are entitled to a deduction under section 164(a)(4); otherwise, they are not. Id.
The parties have neither considered nor briefed that issue. However, our review of New York State law shows that New York State specifically imposes *495 the sales tax upon the purchaser. Section 1133(b) of the New York Tax Law (McKinney 1987) (under Article 28, dealing with sales and compensating use taxes) provides: Where any customer has failed to pay a tax imposed by this article to the person required to collect the same, then in addition to all other rights, obligations and remedies provided, such tax shall be payable by the customer directly to the tax commission and it shall be the duty of the customer to file a return with the tax commission and to pay the tax to it within twenty days of the date the tax was required to be paid. Thus, New York State explicitly places the duty of paying sales tax on the purchaser. [14] Petitioners are therefore entitled to deduct the sales tax under section 164(a)(4). *496 D. Improperly Capitalized Expenses
Petitioners argue that they improperly capitalized certain expenses on their income tax returns and ask this Court to correct those errors. Southern Pacific Transp. Co. v. Commissioner, 75 T.C. 497, 682-687 (1980), supplemented by 82 T.C. 122 (1984). We agree that we have the authority to make corrections of the type petitioners seek. Id. Specifically, petitioners argue that they improperly capitalized: (1) The $ 6,000 freight expense; (2) the $ 6,795 relocation expense of disassembling, moving, and reassembling existing shelving owned by Standard; and (3) the $ 51,679.89 expense of installing the pallet racking. Respondent argues that petitioners correctly capitalized those costs. Petitioners' arguments are premised on the assumption that we would find the 1980 Transaction to constitute a true lease. We have not done so. We do not have the benefit of briefs by the parties addressing those expenses in the context of our finding a sale of the pallet racking from the Kwiat Group to Standard. We believe that those expenditures should be treated either as a cost of the property sold, a reduction *497 of the purchase price, or, in the case of the relocation expense, a reimbursed service charge. In any event, no immediate tax benefit results, which would reduce petitioners' deficiencies. Accordingly, we redetermine no change on account of such expenditures. VI. Increased Interest and Additions to Tax
A. Tax-Motivated Transaction
To the extent that this Court finds there to be any substantial underpayment of tax due to a tax-motivated transaction, respondent contends that the interest accruing after December 31, 1984, on such underpayment ought to be 120 percent of the normal rate determined under section 6621(b). Sec. 6621(c)(1). Section 6621(c)(3)(A) defines a tax-motivated transaction, generally, as: (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period. *498 [Emphasis added.] Respondent asserts that section 6621(c)(3)(A)(iv) applies, arguing that petitioners' use of a depreciation method (where they had no depreciable interest in the pallet racking) constitutes the use of an accounting method resulting in a substantial distortion of income. Section 301.6621-2T, Q&A 3(9), Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391-50392 (Dec. 28. 1984), lists various circumstances under which a deduction or credit disallowed, or income included, shall be treated as attributable to the use of an accounting method that may result in a substantial distortion of income, within the meaning of section 6621. The only applicable circumstance provided by the regulation is: "In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because * * * (iii) the deduction resulted in a material distortion of income." Id. (emphasis added). A taxpayer using an accrual method does not fall within the above circumstance. Accordingly, section 6621(c)(3)(A)(iv) does not apply and we will not sustain respondent's determination of increased *499 interest under section 6621(c). B. Negligence or Disregard of Rules and Regulations
1. David S. and Shirley R. Kwiat
On brief, respondent has conceded the addition to tax, under section 6653(a), against David S. and Shirley R. Kwiat. Accordingly, we will not sustain that addition to tax. 2. Lowell M. and Fern Kwiat
Respondent maintains that the deficiency of Lowell and Fern Kwiat is attributable to negligence or disregard or rules and regulations, within the meaning of section 6653(a). [15] In support of that contention, respondent emphasizes: (1) That Lowell Kwiat was the architect of the "lease" transaction; (2) that Lowell Kwiat has a bachelor of science degree in economics from the Wharton School of Finance; and (3) that Lowell Kwiat is generally an astute business person with significant financial and tax knowledge. Accordingly, respondent concludes: (1) That Lowell Kwiat knew the warranty cost to be fictitious and that petitioners therefore were not entitled to the investment tax credit, and (2) that Lowell Kwiat must have understood the put and call agreements to place the benefits and burdens of owning the pallet racking on Standard, making petitioners *500 ineligible for the depreciation deduction. We disagree with both conclusions. As to the first, having concluded that the warranty cost is not fictitious, we are unable to conclude that petitioner Lowell Kwiat knew otherwise. As to the second, petitioners have adduced legal authority adequate to support a reasonable belief that the put and call agreements would not necessarily shift the benefits and burdens of owning the pallet racking to Standard, thereby making petitioners ineligible for depreciation. See Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837, 841 (1978). Our determination that the "lease" transaction was, for tax purposes, a sale is not inconsistent with petitioner Lowell Kwiat's having held a reasonable view to the contrary. Accordingly, we will not sustain the addition to tax under section 6653(a). *501 Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners have been consolidated herewith: Lowell M. and Fern Kwiat, docket No. 41302-86; and David S. and Shirley R. Kwiat, docket No. 41305-86.↩
1. Formerly sec. 6621(d). It was redesignated as sec. 6621(c)↩ by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744, and repealed by section 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399, effective for returns the due date for which (determined without regard to extensions) is after Dec. 31, 1989.
2. However, the 1980 Call provided that if, at the time it were exercised, the Kwiat Group had financed its investment in the pallet racking at a constant rate of interest other than 13 percent per annum, the interest rate on the $ 159,452 principal amount would be equal to such constant rate and the monthly payments would be adjusted accordingly.↩
3. Petitioners suggest that the transaction at issue, if not a lease, must have been a loan. That is not inconsistent with the view that such transaction was a sale on credit (installment sale), since a sale on credit is merely a loan and a sale combined in the same transaction.↩
4. Respondent does not argue, however, that the transaction should be characterized as a sale (or loan). Apparently hoping that, notwithstanding her argument that petitioners did not possess the benefits and burdens of ownership, we will hold that petitioners were owners of the pallet racking so as to be required to take into gross income the "rent" payments received, respondent refuses to commit to either of those conclusions. Respondent has perhaps forgotten that, in her notices of deficiency, she explained her determinations as resulting from adjustments that, among other things, eliminated both depreciation deductions and↩ rent from petitioners' returns. Of course, petitioners have assigned error to those adjustments. Petitioners have also argued, in the alternative, that the transactions constitute loans, and the "rent" payments constitute repayments of principal or returns of capital. Inasmuch as we perceive no alternative, and respondent has offered none, we act under the assumption that if the transaction is not a lease, it must be a sale (or loan). 5. Only a strained exercise of imagination can conceive of a situation where, from the perspective in 1980, neither the 1980 Put nor the 1980 Call would be exercised (or some economically equivalent substitute agreed to) and the benefits or burdens of ownership would fall upon petitioners. Such situation would come about only if the value of the pallet racking, from Oct. 13, 1985, to Dec. 31, 1986, remained above $ 238,910 and if such value thereafter fell sharply, remaining below $ 159,452, from Nov. 13, 1987, to Dec. 31, 1987. While such a scenario seems far from impossible, it also seems highly unlikely. It is much more likely that, from the perspective in 1980, petitioners would neither profit nor lose by any fluctuation in the value of the pallet racking.↩
6. In Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837, 839↩ (1978), the call was exercisable the day following the expiration of the put. Here, there is an approximately 11-month gap between the expiration of the 1980 Put and the first day on which the 1980 Call might have been exercised.
7. Obviously, an unreasonably low put price or an unreasonably high call price would have little effect upon the benefits or burdens of ownership. We do not here deal with that situation. ↩
8. Inasmuch as the "benefits and burdens of ownership" inquiry focuses primarily upon the risk of economic depreciation and the benefit of possible appreciation, it might aid the understanding to consider whether the ostensible lessor has retained the majority of the potential↩ benefits and burdens of ownership.
9. For the sole purpose of considering this argument, we accept petitioners' computations.↩
10. As we have stated, supra note 3, such conclusion is not inconsistent with petitioners' alternative, that the 1980 Transaction, if it did not constitute a lease, constituted a loan. Respondent has not expressed a preference between characterization as a secured loan or a secured sale, and petitioners have not introduced evidence to overcome the form of an initial sale from Warehouse Storage to the Kwiat Group (which form leads to the conclusion of a secured sale to Standard). Cf. Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837, 842↩ (1978) (strong-proof rule).
11. Petitioners also argue that, under the doctrine of Estate of Wiggins v. Commissioner, 72 T.C. 701 (1979), the cost recovery reporting method should apply to this transaction (if it is a loan (sale)), since the payments to be received by petitioners were indefinite. Estate of Wiggins applies Burnet v. Logan, 283 U.S. 404↩ (1931), and need not separately be discussed. 12. On brief, petitioners do not distinguish between income in the nature of interest and gain in the sec. 1001 sense.↩
13. Whether, in some other transaction, we would treat the cost of the warranty as an expense deductible, in part or in whole, the year the warranty is received is a question we leave for another day.↩
14. That is not to say, however, that no such duty is placed on sellers. Sec. 1133(a)↩ of the New York Tax Law (McKinney 1987) provides in part that "Except as otherwise provided in section eleven hundred thirty-seven, every person required to collect any tax imposed by this article shall be personally liable for the tax imposed, collected or required to be collected under this article." Thus, it would appear that New York State imposes the sales tax, by law, on both purchaser and seller. We perceive no inconsistency between seller's apparent liability and our conclusion that New York places a similar liability on purchaser.
15. Sec. 6653(a) provides: (a) Negligence Or Intentional Disregard Of Rules And Regulations With Respect To Income, Gift, Or Windfall Profits Taxes -- . If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B (relating to income taxes and gift taxes), or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩