SOUTHERN PACIFIC TRANSPORTATION COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3493–69.    Filed January 18, 1984.

*Arnold I. Weber*, for the petitioner.
*Peter D. Bakutes*, for the respondent.

### SUPPLEMENTAL OPINION

DRENNEN, *Judge*: Our opinion in this matter called for the decision to be entered under Rule 155, Tax Court Rules of Practice and Procedure. See *Southern Pacific Transportation*

---

*Co. v. Commissioner*, 75 T.C. 497, 850 (1980). The parties have submitted their computations under Rule 155, and for the most part they are in accord.

The parties have advised the Court that they are in disagreement as to two points. One matter of disagreement arises in connection with the portion of our opinion entitled *"Issues (1) and (ccc)*: Relay Rail" (see 75 T.C. at 498, 726–746), and the other matter of disagreement arises in connection with the portion of our opinion entitled *"Issues (pp) and (qq)*: Historical Costs as Tax Basis" (see 75 T.C. at 499, 807–842).

## *Relay Rail*

In our opinion, we held that respondent's determination to increase the salvage value of used rail which petitioner recovered for reuse was, on the facts of this case, a change by respondent in petitioner's method of accounting under sec. 481 of the Internal Revenue Code. 75 T.C. at 739–746. However, the parties did not address themselves at trial to the question of the actual adjustments required under sec. 481, reserving that matter for later consideration by the Court if they could not agree. 75 T.C. at 740. The parties have now advised the Court that they are in disagreement as to whether the section 481 adjustment is to be made entirely in 1959, as respondent contends, or whether it is to be spread out over a 10-year period, as petitioner contends.

The change in accounting method initiated by respondent and approved by the Court relates to the salvage value which petitioner assigned to its relay rail. For the reasons set forth in our opinion (see 75 T.C. at 732–733), the new accounting method decreases petitioner's deductions for operating expenses and, therefore, increases its taxable income. As a result, the section 481 adjustment involved herein is directed at restoring improperly deducted amounts to income.

Section 481(a) provides in pertinent part:

SEC. 481(a). GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted * * *

Petitioner contends that the section 481(a) adjustment relating to this issue should be computed in such a manner as to spread the increase in petitioner's income over a 10-year year period. Respondent declines to permit such spreading and insists that the entire adjustment be taken in the year 1959, the "year of the change."[1]

The statute clearly imposes no obligation on respondent to permit a taxpayer such as petitioner to extend his section 481(a) adjustment over a period of years. To the contrary, Congress has granted to respondent very broad authority and discretion to determine the manner in which the taxpayer is to make the adjustments required by that statutory provision. Section 481(c) provides:

SEC. 481(c). ADJUSTMENTS UNDER REGULATIONS.—In the case of any change described in subsection (a), the taxpayer may, in such manner and subject to such conditions as the Secretary may by regulations prescribe, take the adjustments required by subsection (a)(2) into account in computing the tax imposed by this chapter for the taxable year or years permitted under such regulations.

The regulations adopted by respondent pursuant to this authority set forth a very specific procedure for taxpayers to follow when they seek to employ an adjustment method that is not set forth in the statute. The pertinent provision, section 1.481–5, Income Tax Reg., provides:

(a) In addition to the methods of allocation described in section 481(b), the adjustments required by section 481(a) may be taken into account in computing the tax under chapter 1 of the Code for such taxable years, in such manner and subject to such conditions as may be agreed upon between

---

[1]We note in passing that the parties stipulated (Supplemental Stipulation of Facts No. 14, par. 36) that "if in the final disposition of this issue there is an increase in the salvage value * * * for relay rail, the amounts capitalized as a result for tax purposes may be amortized over a 20-year period." See *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 734 n. 276 (1980). This amortization, under Rev. Proc. 68–46, 1968-2 C.B. 961, is a different adjustment from the one discussed in the text. The stipulation reflects the necessary addition to petitioner's assets account (also pursuant to sec. 481) to correct petitioner's basis; this corrected amount may then be ratably depreciated. Both petitioner's and respondent's computations allow for this 20-year amortization, and it is not at issue herein. (The instant dispute relates to the spreading over several years of the "year of change" adjustment under sec. 481(a) occasioned by the increase in petitioner's taxable income which results from the use of fair market value as the salvage value of relay rail.)

the Commissioner and the taxpayer. See section 481(c). Requests for approval of a method of allocation differing from those described in section 481(b) shall be addressed to the Commissioner of Internal Revenue * * * and shall set forth in detail the facts and circumstances upon which the taxpayer bases his request. Permission will be granted only if the taxpayer and the Commissioner agree to the terms and conditions under which the allocation is to be effected.

(b) The agreement shall be in writing and shall be signed by the Commissioner and the taxpayer. It shall set forth the items to be adjusted, the amount of the adjustments, the taxable year or years for which the adjustments are to be taken into account, and the amount of the adjustments allocable to each such year. * * *

Additional procedures adopted by the respondent have been set forth in various Revenue Procedures. See, e.g., Rev. Proc. 80–51, 1980–2 C.B. 818, and Rev. Proc. 79–47, 1979–2 C.B. 528, wherein respondent describes the procedures to be followed by a taxpayer desiring to spread the adjustment under section 481(a) over a number of years. The application of these rulings is limited to those instances where the taxpayer initiated and obtained permission for the change. Their purpose is to "ameliorate, at least in part, the otherwise distortive effect of the section 481(a) adjustment." 1980–2 C.B. at 819. However, they do not apply to cases, such as the present one, where the respondent (and *not* the taxpayer) initiated the change in method of accounting.

It is clear from the foregoing authorities that, even though the section 481(a) adjustment is generally made in one year (see, e.g., *Coors v. Commissioner*, 60 T.C. 368, 400 (1973), affd. 519 F.2d 1280 (10th Cir. 1975)), there is no requirement in the statute that the adjustment be limited to only one taxable year. On the other hand, it is equally clear from these authorities that a taxpayer is not entitled to extend the adjustment beyond the "year of the change" unless the taxpayer has applied for and obtained the respondent's agreement or approval. Cf. *McGrath & Son, Inc. v. United States*, 549 F. Supp. 491, 494 (S.D. N.Y. 1982).

Given the broad authority granted to respondent under section 481(c) and the provisions of section 1.481–5, Income Tax Regs., and given the absence of authority in support of petitioner's position, we conclude that the section 481(a) adjustment required by our opinion on the relay rail issue is to be made entirely in the year 1959.

### *Historical Costs as Tax Basis*

In our opinion, we held that petitioner could not use its recently developed "historical costs" of certain pre–1914 assets to establish the tax basis of those assets; instead, petitioner had to continue its customary practice of using as its tax basis for those assets, the costs of the assets as determined by the Interstate Commerce Commission pursuant to the Physical Valuation of Property Act of 1913 (the "ICC amounts"). 75 T.C. at 826–842. Among the reasons for our holding were: (1) The "historical costs" were not adequate to establish tax basis (75 T.C. at 826–834); (2) to the extent assets were transferred to a successor corporation prior to 1918, the costs incurred by a predecessor corporation for assets could not stand as their tax basis (75 T.C. at 834–837); and (3) petitioner was estopped and otherwise precluded under the doctrine of election and laches (staleness of demand (claim)) from denying that the ICC amounts properly reflect the tax basis of the pre–1914 assets and from claiming that "historical costs" should be used to establish such basis (75 T.C. at 837–842).

In connection with the Rule 155 computation, petitioner seeks to use "detailed costs" (or "early costs") to establish the tax basis for certain pre–1914 assets rather than the ICC amounts, claiming that these "detailed costs," purportedly based on petitioner's old books and records, do not possess some of the "arguable infirmities" of its "historical costs." Petitioner's Second Report on Rule 155 Computations, filed Dec. 5, 1983, at pp. 5–7. Petitioner appears to be of the view that our opinion as to this issue was not intended to be of general application on the question of whether petitioner could use its old books and records to establish tax basis and that our conclusions do not apply to certain "early costs" which petitioner regards as more reliable than the "historical costs" discussed in our opinion.

We believe it is clear from our opinion that, in those instances where petitioner's tax returns for the years at issue relied on the ICC amounts to reflect the tax basis of its pre–1914 assets, petitioner is now precluded from utilizing its old books and records for the purpose of establishing a different tax basis for those assets.

In an extended trial on the "historical costs" issue, petitioner was given ample opportunity to show the reliability of its old books and records and of the efforts of the Southern Pacific Research Team (SPRT) in attempting to research and reconstruct the costs involved. Petitioner failed to do so. Our opinion clearly states that petitioner's records were incomplete and unreliable insofar as they are pertinent to the assets at issue. 75 T.C. at 831. Moreover, our opinion points out that the SPRT "had to engage in an extensive amount of assumption and approximation" and had merely made "sophisticated guesses" which were not even "a reasonable *estimate* of actual costs." 75 T.C. at 834. If petitioner had superior books and records or more sophisticated reconstructions for the costs of some of its pre–1914 assets, it could have brought them to the Court's attention at trial. Petitioner did not do so and left it for the Court to conclude that petitioner could not show the actual costs of any of the pre–1914 assets at issue in this case. It is too late now, during the Rule 155 process, for petitioner to contest our findings, and it is too late for petitioner to seek to introduce additional evidence relating to the actual costs of its assets. Rule 155(c), Tax Court Rules of Practice and Procedure; see *Estate of Stein v. Commissioner*, 40 T.C. 275, 279–280 (1963).

In addition, it is clearly stated in our opinion that "principles of estoppel are applicable on the facts of this case and that petitioner should be barred at this late date from claiming that the ICC amounts used on its returns do not properly reflect its tax basis in the assets at issue." 75 T.C. at 837–838. Specifically, we pointed out in the opinion that "petitioner's inexcusable delay" in claiming that it had records which established its tax basis in its pre–1914 assets has placed respondent at a distinct disadvantage," and we concluded that "petitioner should be precluded by the doctrine of laches (or staleness of demand (claim)) from contending herein that its tax basis in the assets at issue is to be determined by reference to 'historical costs.'" 75 T.C. at 842. See *United States v. Matheson*, 532 F.2d 809, 820–821 (2d Cir. 1976). Once again, in proposing its computations under Rule 155, petitioner is placing respondent at a disadvantage by claiming that it can rely on its old books and records rather than the ICC amounts. For the reasons set forth

at length in our opinion (75 T.C. at 837–842), we hold that petitioner is precluded from doing so.

Petitioner contends that "there were repeated general representations by various of respondent's personnel that some costs might be accepted as tax basis by respondent." Petitioner's Second Report on Rule 155, filed Dec. 5, 1983, at p. 5. Respondent denies that any such representations were made. We obviously have no way of knowing what transpired in any discussions among the respective counsel in this case. What is critical is that no stipulation relating to the use of petitioner's books and records in this context has been filed by the parties. In the absence of any such agreement between the parties, we are unable to give any weight to petitioner's assertions.

Accordingly, consistent with our opinion, to the extent that petitioner used the ICC amounts on its returns to reflect the tax basis of any of the pre–1914 assets at issue in this case, such amounts shall be utilized by the parties as the tax basis of those assets in making their computations under Rule 155.

*An appropriate order has been entered.*