CLIFFORD R. CASHMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cashman v. Commissioner
Docket No. 24384-89
United States Tax Court
T.C. Memo 1991-359; 1991 Tax Ct. Memo LEXIS 408; 62 T.C.M. (CCH) 322; T.C.M. (RIA) 91359; August 5, 1991, Filed *408 Decision will be entered under Rule 155. Clifford R. Cashman, pro se. Donna J. Pankowski, for the respondent. RUWE, Judge. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax in petitioner's Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)[1]
Sec. 6653(a)(2)
Sec. 6661[2]
1982
$  2,255.34
$ 112.77
*
--
1983
3,165.63
158.28
*
--
1984
8,089.00
404.50
*
$ 2,022.50
1985
11,986.76
599.35
*
2,996.75
After concessions by the parties, the issues for decision are: (1) Whether petitioner sustained a business bad *409 debt of $ 63,470.42 in 1982; (2) whether petitioner is entitled to an investment tax credit of $ 4,310.00 in 1985. (Resolution of this issue is dependent upon resolution of the bad debt issue because if respondent's determination regarding the bad debt issue is sustained, the investment tax credit would be fully utilized in 1982); and (3) whether petitioner is liable for the additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and (2) for 1982, 1983, 1984, and 1985. FINDINGS OF FACT Most of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Altoona, Pennsylvania, when he filed his petition in this case. In the early 1970s, petitioner was an insurance salesman. He was also the proprietor of a pizza and sandwich shop. Clyde Lynn was also an insurance salesman and the proprietor of a pizza and sandwich shop. In 1973, petitioner and Mr. Lynn formed a partnership known as Cashman and Lynn Associates (C & L Assocs.). The business of the partnership included an insurance agency, some rental properties, and the operation of the two pizza *410 shops. The pizza shops were operated under the name "Sizzler." From 1973 to 1976, C & L Assocs. opened additional Sizzler locations. However, by the end of 1976, only two Sizzler shops remained open. During 1976, C & L Assocs. purchased a restaurant named Chilcoat's. Altoona Ice Cream Parlors, Inc. (Altoona) was a corporation formed in 1970. Altoona operated a restaurant doing business under the name of "Alaskaland." On October 31, 1977, petitioner and Mr. Lynn purchased 100 percent of the stock in Altoona for $ 150,000. Fifty percent of the stock ownership was attributed to petitioner. One hundred twenty-five thousand dollars ($ 125,000) of the purchase price was borrowed by petitioner and Mr. Lynn from Mid-State Bank. Altoona guaranteed the $ 125,000 loan. Altoona reported income of $ 1,394.67 in 1977. In 1978, Altoona elected to be treated as a subchapter S corporation. The corporation experienced losses in 1978, 1979, 1980, and 1981 in the respective amounts of $ 33,636.63, $ 30,922.47, $ 79,912.19, and $ 15,630.57. Petitioner claimed his distributive share of Altoona's losses for those years in the amounts of $ 16,818.31, $ 15,461.23, $ 39,956.09, and $ 7,815.28, *411 respectively. The corporation reported a profit of $ 963.83 for 1982. Petitioner received no wages from the corporation during the years 1979 through 1982. As of January 1, 1979, petitioner and Mr. Lynn dissolved their C & L Assocs. partnership. Pursuant to the terms of the dissolution, Chilcoat's Restaurant and one Sizzler were retained by Mr. Lynn, while petitioner kept the other Sizzler and the insurance agency. Each partner was to assume responsibility for all debts and mortgages connected with the respective businesses which he acquired upon the partnership termination. No changes were made to the stock ownership in Altoona. The partnership termination agreement is silent with regard to any amounts which were advanced by it to Altoona. In September 1979, Altoona secured a loan from Mid-State Bank to purchase additional equipment. In 1981, petitioner and Mr. Lynn personally borrowed $ 30,000 from Laurel Bank. Twenty-five thousand dollars ($ 25,000) of this was transferred to Altoona. Sometime in 1981, Altoona ceased to operate the Alaskaland restaurant and the restaurant was leased to Nancy Pietrolunzo. Ms. Pietrolunzo wished to purchase the business but was unable *412 to obtain financing. In 1982, petitioner abandoned all efforts to make Altoona profitable and locked the premises. At that time, money was still owed on the loan for the purchase of the stock, the personal loan from Laurel Bank, and the loan for the equipment purchase. After petitioner abandoned efforts to make the corporation profitable, Mr. Lynn decided personally to take over the corporation's business. To effectuate this, the corporation transferred its equipment to Mr. Lynn and Mr. Lynn took over the leased premises. The corporation treated the transfer as a sale of the equipment for its book value of $ 15,468.67. Mr. Lynn "paid" that amount by reducing the amount shown as "advances" which he made to Altoona and by assuming the remaining balance due on the equipment loan. Mr. Lynn also assumed the remaining obligation at Mid-State Bank for the initial stock purchase, while petitioner assumed the obligation at Laurel Bank. Altoona was dissolved at the end of 1982. During the period from 1978 through 1982, petitioner and Mr. Lynn supplied funds to the corporation to pay operating expenses. Petitioner claims that he made annual advances to Altoona in the following net amounts: *413 Year
Advances
1978
($  4,530.12)
1979
26,118.90
1980
11,144.15
1981
27,960.43
1982   7,346.10
$ 68,039.46  These numbers are derived from petitioner's accountant's reconstruction entitled "Cliff Cashman - Analysis of Advances 1978 to 1982." There is a negative balance for 1978 because the accountant's reconstruction shows that corporate funds transferred to petitioner exceeded the amounts which he advanced to the corporation. The accountant's reconstruction includes funds which were transferred from C & L Assocs. to the corporation. The workpapers prepared by the accountant indicate that one-half of the transfers from C & L Assocs. were treated as advances by petitioner. In a letter dated September 8, 1983, to petitioner and Mr. Lynn, the accountant states that he has "presented all advances to the corporation as stockholder loans." Altoona's Federal corporate income tax returns, Form 1120S, for the years 1979 through 1982 report increasing amounts of loans from shareholders. However, Altoona's 1979 through 1982 Pennsylvania corporate tax returns indicate that it had no indebtedness to any Pennsylvania individual or partnership. On his *414 1982 return, petitioner deducted $ 63,470.42 as an "ordinary loss on worthless stock" with regard to his Altoona stock. Petitioner computed this loss in the following manner: Original Cost of stock - year 1977
$  75,000.00 Net Sub-chapter S Losses
1978 to 1982
(79,569.04)
$ ( 4,569.04)
Additional Funds Advanced to corporation
1977 to 1982 not collectible due
to inventory
68,039.46 Line 1 - Part 1 - Form 4797 - ordinary loss
$  63,470.42 The loss was not fully utilized in 1982; and petitioner elected to carry the loss forward to 1983, 1984, and 1985. The loss and the carryforwards were disallowed by respondent, but petitioner was allowed capital losses of $ 3,000.00 for each of the years 1982, 1983, 1984, and 1985. Petitioner conceded, prior to trial, that he was not entitled to a worthless stock deduction, but contends that the $ 63,470.42 represented a business bad debt which became worthless in 1982. No promissory notes were ever executed on behalf of Altoona for the advances made by petitioner. There was no stated maturity date for repayment of the advances, no interest was charged for the advances, and no security was given for the advances. *415 OPINION The primary issue for decision is whether petitioner may deduct $ 63,470.42 in 1982 as a business bad debt under section 166. Section 166(a) allows a deduction for any debt which becomes worthless within the taxable year. Section 166(d) distinguishes between business and nonbusiness bad debts. "Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs. This is in contrast to an equity investment or contribution to capital. A contribution to capital is not a debt. Kean v. Commissioner, 91 T.C. 575, 594 (1988). Therefore, in analyzing whether petitioner is entitled to a bad debt deduction, we must first determine whether the "advances" which petitioner claims were made between 1978 and 1982 constitute debt or equity for Federal tax purposes. Respondent's determination is presumed correct and petitioner bears the burden of proof. Rule 142. The characterization of advances to a corporation by a shareholder is a question of fact to be determined *416 from all of the facts and circumstances with the burden on the taxpayer to establish that the advances were loans. P. M. Finance Corp. v. Commissioner, 302 F.2d 786, 789 (3d Cir. 1962), affg. a Memorandum Opinion of this Court. The courts have enumerated a nonexclusive list of factors to be considered in determining whether "advances," such as those involved in the instant case, are loans or equity investments. The Third Circuit has considered the following list of factors in making debt-equity determinations. (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the "thinness" of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest *417 payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation. [Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (3d Cir. 1968) (fn. ref. omitted).]
The court in Fin Hay went on to state that; The various factors which have been identified in the cases are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship. * * * [Fin Hay Realty Co. v. United States, supra at 697; fn. ref. omitted.]
This language makes clear that the ultimate issue and the key to the analysis is whether an outside creditor would have made a loan on the same terms and in the same form as the shareholder-creditor. Segel v. Commissioner, 89 T.C. 816, 828 (1987) (citing Scriptomatic, Inc. v. United States, 555 F.2d 364, 367 (3d Cir. 1977)). *418 We find that petitioner has failed to carry his burden of proof. Many of the Fin Hay factors cannot be considered in light of the scarcity of evidence. However, those factors that can be considered militate against petitioner's position. Petitioner owned 50 percent of the stock of Altoona and was involved in the management of its business on a daily basis. His numerous advances to the corporation were made without formal indicia of a loan arrangement. There were no promissory notes or other documents to evidence a debtor-creditor relationship. There was no provision for interest on the advances, nor was there a stated maturity date. Petitioner has failed to present any credible evidence of any provision for repayment of the advances. [3] Clearly, no third-party creditor would have made loans to Altoona under these conditions. *419 Petitioner's attempt to deduct these advances on his 1982 return as losses on worthless stock appears to be inconsistent with his present contention that they were loans. While the treatment of an item on a return is not binding on petitioner, it constitutes some evidence that petitioner intended the advances as contributions to capital. Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 663 (1980), supplemented by 82 T.C. 122 (1984); Siewert v. Commissioner, 72 T.C. 326, 337 (1979). Upon review of the entire record, we find petitioner has failed to carry his burden. The next issue concerns respondent's disallowance of an investment tax credit of $ 4,310.00 claimed by petitioner in 1985. This issue is directly dependent upon resolution of the bad debt issue. As a result of our disallowance of the claimed bad debt of $ 63,470.42, the investment tax credit will be fully utilized in 1982. The next issue for decision is whether petitioner is liable for the additions to tax for negligence under section 6653(a)(1) and (2) for the years 1982, 1983, 1984, and 1985. Section 6653(a)(1) provides that if any part *420 of any underpayment of any tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(2) provides that there shall be added to the tax, in addition to the 5 percent addition provided in section 6653(a)(1), an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. For purposes of this section, negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed correct and petitioner bears the burden of proving otherwise. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioner initially reported on his 1982 return that the $ 63,470.42 was deductible as an ordinary loss from worthless stock. He has since conceded this position and, based on the *421 evidence presented, petitioner has not proven that he had a reasonable basis to believe that the "advances" to Altoona were deductible as a bad debt. Petitioner has conceded that he failed to report income from insurance sales in both 1983 and 1984. He offered no evidence that these omissions were due to reasonable cause. In light of the foregoing, we find that all of the understatements are due to negligence and that petitioner is liable for additions to tax under section 6653(a)(1) and (2) for the years 1982, 1983, 1984, and 1985. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent concedes that petitioner is not liable for the section 6661 additions to tax.↩
*. 50 percent of the interest due on the entire deficiency. ↩
3. Altoona's corporate Federal income tax returns for 1979 through 1982, report increasing amounts of shareholder loans on its balance sheets. However, Altoona's Federal tax returns are directly contradicted by its corporate income tax returns for the Commonwealth of Pennsylvania for those years, in which Altoona denied having any outstanding indebtedness to any Pennsylvania resident individual, or partnership.↩