# United States Tax Court

T.C. Memo. 2025-32

DOUGLAS E. HAMPTON,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 33493-21.                          Filed April 10, 2025.

————

P pleaded guilty to bribery, fraud, and money laundering in 2013, which ultimately led to the U.S. Marshals Service's seizing money from P's and his S Corp's bank accounts in 2016. P deducted a flowthrough loss from the forfeiture of the S Corp's portion of seized funds. R disallowed the loss deduction. Other issues in the case were abandoned by P or are computational.

*Held*: The forfeiture loss deduction disallowance is sustained for public policy reasons.

————

*David James Lewis* and *Terry J. Evans*, for petitioner.

*Michelle R. Gearity* and *John D. Davis*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: Petitioner, Douglas E. Hampton, pleaded guilty to charges of bribery, fraud, and money laundering in 2013, and the U.S. District Court for the Southern District of Ohio ordered Mr. Hampton to forfeit approximately $2.2 million of the resultant accretions to income and wealth. Thus in 2016 the U.S. Marshals

[*2] Service seized money from several bank accounts held in the name of Mr. Hampton or his wholly owned corporation, Hampton Capital Management, Inc. (HCM), an electing small business corporation (S corporation). *See* I.R.C. §§ 1361 and 1362.[1] HCM claimed a loss deduction of $855,882 on its 2016 Form 1120S, U.S. Income Tax Return for an S Corporation, related to its portion of the asset seizures, and Mr. Hampton reported a corresponding passthrough loss on his 2016 Form 1040, U.S. Individual Income Tax Return, on account of HCM's reported loss. The Commissioner determined that Mr. Hampton was not entitled to deduct the passthrough loss, and Mr. Hampton petitioned our Court for review of that determination.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. We incorporate by this reference the parties' Stipulation of Facts and the attached Exhibits. Mr. Hampton resided in Ohio when he timely filed his Petition.

*Financial Services Business*

Mr. Hampton began his career working for Merrill Lynch and Morgan Stanley. In 2002 he registered the trade name "Hampton Capital Management" in his personal capacity for use in his business activities.[2] In 2003 he incorporated HCM. Mr. Hampton was HCM's sole owner, and he and an administrative assistant were HCM's only employees.

As relevant here, Mr. Hampton was a registered representative for three separate broker-dealers from 2004 to 2013: First Montauk Securities Corp. (First Montauk) (2004–08), First Allied Securities, Inc. (2008–12), and First Allied Advisory Services, Inc. (2012–13). (We refer to both First Allied Securities, Inc., and First Allied Advisory Services, Inc., as "First Allied.") In that capacity Mr. Hampton provided asset

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The registration expired in 2013, and HCM took over registration of that name at that time.

[*3] management, financial planning, and college planning services to retail and institutional clients.[3]

Between 2009 and 2013 most or all of Mr. Hampton's financial services earnings came in the form of commissions remitted by First Montauk, First Allied, and Viad Corp. Mr. Hampton received all commissions from the broker-dealers in his personal capacity. None of the payors ever named HCM as the recipient of a commission. HCM was never registered with the Securities and Exchange Commission or the Financial Industry Regulatory Authority (more commonly known as FINRA). For its part, HCM maintained brokerage accounts with First Allied from at least March 2010 to May 2016, through which it traded on its own account.

From at least 2009 through 2013 Mr. Hampton and HCM reported the financial services earnings for tax purposes as follows:

1. Mr. Hampton included his commissions as gross receipts on Schedule C, Profit or Loss From Business, of his Form 1040.[4]

2. Mr. Hampton then reported exactly the same amount as "Other expenses" on Schedule C and explained the expense deduction as "AMOUNTS ASSIGNED TO HAMPTON CAPITAL MANAGEMENT," yielding zero Schedule C net profit.

3. HCM included exactly the same commission "AMOUNTS ASSIGNED" as gross receipts on its yearly Forms 1120S.

4. Mr. Hampton then reported a portion of HCM's assigned commission earnings as wage income on his Form 1040.

---

[3] It is unclear whether and, if so, to what extent Mr. Hampton used the trade name "Hampton Capital Management" in his interactions with clients.

[4] The "Business name" on each of the Schedules C for tax years 2009 and 2011–13 is "DOUG HAMPTON," and for tax year 2010 it is "DOUGLAS E HAMPTON." Each of the 2009–13 Forms 1040 was filed jointly by Mr. Hampton and Jennifer L. Hampton; however, Ms. Hampton is not a party to this case. Mr. Hampton's filing status for 2016 changed to single.

[*4]  5.  HCM deducted as expenses "Compensation of officers" in an amount equal to or greater than the wage income from HCM reported by Mr. Hampton.[5]

As HCM's sole shareholder, Mr. Hampton reported HCM's net profit as income via Schedule E, Supplemental Income and Loss, of his Form 1040.

*Criminal Activity and Asset Forfeiture*

In 2008 one of Mr. Hampton's high school friends was appointed chief financial officer of the Office of the Treasurer of the State of Ohio. In February 2009 that friend was also appointed deputy treasurer of the State of Ohio.  Mr. Hampton and the deputy treasurer then secretly devised the following plan: The deputy treasurer would ensure that Mr. Hampton was included on the list of brokers authorized to conduct securities trades on behalf of the State of Ohio and that a large amount of trading business was directed to Mr. Hampton.  In return Mr. Hampton would send portions of the commissions he earned from trading for the State of Ohio to the deputy treasurer and two other individuals (friends and associates of the deputy treasurer), disguised as legal fees or business loans.

In carrying out the plan Mr. Hampton executed a series of trades for the State of Ohio between October 2, 2009, and August 31, 2010, receiving total commissions of approximately $3.2 million.  During this same time Mr. Hampton paid approximately $524,000 of his commission earnings to the deputy treasurer and the two others involved in the plan.

The U.S. Government learned of the misappropriation and filed a criminal Information against Mr. Hampton in the U.S. District Court in 2013, alleging the above facts and charging Mr. Hampton with one count of "knowingly conspir[ing] and agree[ing] with [others] to commit offenses against the United States, including federal program bribery, honest services wire fraud, and money laundering."

---

[5] For tax years 2009–11 the HCM wages reported by Mr. Hampton exactly equal HCM's claimed deduction for "Compensation of officers."  HCM's 2012 Form 1120S claimed a $50,000 deduction for "Compensation of officers," while Mr. Hampton's 2012 Form 1040 reported wages from HCM of only $33,000.  HCM's 2013 Form 1120S claimed an $11,070 deduction for "Compensation of officers," while Mr. Hampton's 2013 Form 1040 reported wages from HCM of only $1,070.

**[\*5]**  Mr. Hampton pleaded guilty to the conspiracy count, and in 2014 the district court sentenced him to 45 months of imprisonment, three years of supervised release, a $100 penalty, and forfeiture of approximately $2.2 million.[6] Mr. Hampton and the United States then signed a Consent Order of Forfeiture, providing in relevant part as follows:

> That Defendant Douglas E. Hampton shall forfeit the following subject property to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c):
>
> Any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the violations in Count One of the Information, including but not limited to a sum of money equal to $2,202,259.91 in United States currency in the form of a forfeiture money judgment.
>
> ### Substitute Assets
>
> Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and 28 U.S.C. §2461(c),[7] Defendant Douglas E. Hampton shall forfeit substitute property,[8] up to the value of the $2,202,259.91 forfeiture money judgment if, as a result of any act or omission of Defendant Douglas E. Hampton[,] the forfeitable property so described, or any portion thereof:

---

[6] The district court's judgment includes a form titled "Criminal Monetary Penalties," which indicates an "Assessment" of $100 but leaves blank the spaces provided for amounts of any "Restitution" or "Restitution Ordered."

[7] Title 28 U.S.C. § 2461(c) provides in relevant part (and with an exception not relevant here) that "[t]he procedures in [21 U.S.C. § 853] apply to all stages of a criminal forfeiture proceeding."

[8] Title 21 U.S.C. § 853(p)(2) defines substitute property as follows:

> (2) Substitute property.—In any case described in any of subparagraphs (A) through (E) of paragraph (1) [which subparagraphs are identical to subparagraphs (a) through (e) of the Consent Order of Forfeiture, *supra*], the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

**[\*6]**        (a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty.

(Footnote omitted.)  The Consent Order of Forfeiture also recites that "Defendant Hampton has provided all requested financial information to the United States."

In May 2016 while Mr. Hampton was incarcerated, the district court issued warrants to seize the contents of seven bank accounts held in the name of either "Douglas Hampton" or "Hampton Capital Management."  The U.S. Marshals Service soon thereafter executed the warrants.  A summary of the warrants and the assets seized is shown below:

| *Account Name* | *Amount Seized* |
| --- | --- |
| First Allied Securities Account No. xxxx2172 held in the name of Hampton Capital Management | $716,896.67 |
| E-Trade Account No. xxxx1753 held in the name of Douglas Hampton | 115,950.31 |
| E-Trade Account No. xxxx1487 held in the name of Douglas Hampton | 36,857.42 |
| Citizens Bank Account No. xxxx4539 held in the name of Douglas Hampton | 11,443.13 |
| Citizens Bank Account No. xxxx5568 held in the name of Douglas Hampton | 127,549.61 |
| Citizens Bank Account No. xxxx4605 held in the name of Douglas Hampton | 25,513.67 |
| Pioneer Investments Account No. UNP307658 held in the name of Hampton Capital Management controlled by Douglas Hampton | 148,332.90 |
| **Total** | **$1,182,543.71** |

**[\*7]**   In June 2016 the United States filed a motion in the district court to have the above-listed assets forfeited as "substitute property" pursuant to 21 U.S.C. § 853(p). *See* United States' Mot. Entry Second Prelim. Order of Forfeiture, *United States v. Hampton*, No. 13-cr-180 (S.D. Ohio June 22, 2016). In that motion, the United States noted that it had so far recovered only $170 directly from Mr. Hampton. *Id.* at 2. The district court promptly granted the United States' motion, and the above-listed assets were preliminarily forfeited. *See* Second Prelim. Order of Forfeiture, *Hampton*, No. 13-cr-180 (June 27, 2016). The district court finalized the order of forfeiture after expiration of the period for third parties to file petitions asserting a legal interest in the assets. *See* Second Final Order of Forfeiture, *Hampton*, No. 13-cr-180 (Feb. 1, 2017).

*2016 Tax Reporting and Notice of Deficiency*

On its 2016 Form 1120S, HCM claimed a deduction of $855,882 and attached the following statement:

> HAMPTON CAPITAL MANAGEMENT, INC. (THE "TAXPAYER") MAINTAINED ACCOUNTS WITH FIRST ALLIED SECURITIES AND CITIZENS BANK WITH A COMBINED BALANCE OF $855,882 IN 2016.[9] THE TAXPAYER LOST THIS ACCOUNT BALANCE WHEN THE U.S. MARSHALLS [sic] SERVICE PROCESSED A FORFEITURE AGAINST IT IN 2016. IN UNITED STATES V. DOUGLAS E. HAMPTON (UNITED STATES DISTRICT COURT, S.D. [OHIO], EASTERN DIVISION CR-2-13-180)[,] A CASE INVOLVING THE TAXPAYER'S SHAREHOLDER MR. DOUGLAS HAMPTON, THE COURT ISSUED ON NOVEMBER 13, 2014[,] A CONSENT ORDER OF FORFEITURE, WHICH CONCERNED MR. HAMPTON BUT NOT THIS TAXPAYER. THE TAXPAYER WAS NOT A PARTY IN THE CASE NOR WAS IT IDENTIFIED AS SUBJECT TO THE COURT'S CONSENT ORDER OF FORFEITURE. ACCORDINGLY, BECAUSE THE TAXPAYER

---

[9] We find that HCM held in its name the First Allied account and the Pioneer Investments account but not any of the Citizens Bank accounts. However, the sum of the funds seized from the First Allied account and the Pioneer Investments account is $865,229.57, which exceeds the deduction claimed by HCM ($855,882). Mr. Hampton has not argued in this litigation that HCM was entitled to a deduction greater than $855,882, and we deem him to have abandoned any claim to a higher deduction.

[*8] OPERATED A TRADE OR BUSINESS-FINANCIAL ADVISING AND SALE OF FINANCIAL PRODUCTS-THAT GENERATED THE ACCOUNT BALANCE, THEN IT DEDUCTS ON THIS RETURN THE RESULTING LOSS OF ITS ACCOUNT BALANCE UNDER INTERNAL REVENUE CODE §165.

Because HCM reported $6,547 of gross income for 2016, it reported a net loss of $849,335. Mr. Hampton included that loss in his calculation of Schedule E income on his 2016 Form 1040. *See* I.R.C. § 1366(a) (generally providing that an S corporation shareholder must take into account his pro rata share of the corporation's income or loss).

In a Notice of Deficiency the Commissioner disallowed HCM's $855,882 deduction and accordingly determined an increase in Mr. Hampton's Schedule E income by that amount. The Commissioner also determined (1) a decrease in the allowable personal exemption as a result of the Schedule E income increase, (2) a reduction of self-employment tax from $84 to zero, and (3) a related disallowance of a $42 deduction for one-half of the $84 self-employment tax liability reported by Mr. Hampton.

In his Petition Mr. Hampton assigned error to the Schedule E income increase, the personal exemption decrease, and the disallowance of the $42 deduction for one-half of his reported self-employment tax liability. However, he did not challenge the $84 reduction in self-employment tax, nor did he subsequently raise the self-employment tax deduction in litigation. Therefore, we deem Mr. Hampton to have abandoned his challenge to the $42 deduction disallowance. *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned."). To the extent that the Schedule E income increase is sustained, the personal exemption limitation is computational. Therefore, the only issue for our decision is whether Mr. Hampton was entitled to reduce his Schedule E income by $855,882 on account of the seizure of HCM's bank account balances.

OPINION

I. *Burden of Proof*

Generally, the Commissioner's determinations in a Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving them erroneous. *See* Rule 142(a)(1); *Welch v. Helvering*, 290

[*9] U.S. 111, 115 (1933). In particular the burden of showing entitlement to a claimed deduction is on the taxpayer. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Deductions are to be granted only when allowed by a specific provision of the Code, and such provisions are to be strictly construed. *Id.*

Mr. Hampton does not contend, nor does the record indicate, that the burden of proof has shifted to the Commissioner under section 7491(a), which applies in certain cases when a taxpayer has introduced credible evidence with respect to a factual issue. Before trial Mr. Hampton moved to shift the burden of proof to the Commissioner on the grounds that the Commissioner's late-filed First Amended Pretrial Memorandum raised "new arguments, defenses, and basis for the deficiency which have not been raised with Petitioner before." Pet'r's Mot. Shift Burden of Proof at 2; *see* Rule 142(a)(1) (providing that the Commissioner has the burden of proof "in respect of any new matter"). We denied Mr. Hampton's Motion, and we reiterate here that the Commissioner does not raise a "new matter" merely by providing additional legal argument for disallowing the same deduction that was disallowed in a Notice of Deficiency. *See Hurst v. Commissioner*, 124 T.C. 16, 30 (2005) ("[A] 'new matter' is one that reasonably would alter the evidence presented. A 'new theory' is just a new argument about the existing evidence and is thus allowed.").

II.  *The Public Policy Doctrine*

Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." For individual taxpayers, the deduction is limited to losses incurred (1) in a trade or business, (2) in a transaction entered into for profit, or (3) in certain instances of casualty or theft. I.R.C. § 165(c).

Before 1969, courts applied the "public policy doctrine" to deny taxpayers a deduction for which they otherwise qualified under section 165 or section 162 (relating to ordinary and necessary business expenses) in cases where allowing the deduction would "frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof." *Tank Truck Rentals, Inc. v. Commissioner*, 356 U.S. 30, 33–34 (1958). The Supreme Court clarified that the doctrine virtually always forbids deduction of governmentally imposed fines and penalties, stating that the "[d]eduction of fines and penalties uniformly has been held to

**[\*10]** frustrate state policy in severe and direct fashion by reducing the 'sting' of the penalty prescribed by the state legislature." *Id.* at 35–36.

The Tax Reform Act of 1969, Pub. L. No. 91-172, § 902, 83 Stat. 487, 710–11, amended section 162 to disallow ordinary and necessary business deductions for, among other things, "any fine or similar penalty paid to a government for the violation of any law," essentially codifying the judicial public policy doctrine under section 162. *See* I.R.C. § 162(f).[10]

Regardless, the judicial public policy doctrine has continuing vitality in the context of loss deductions under section 165.[11] *See, e.g.*, *Nacchio v. United States*, 824 F.3d 1370, 1374 (Fed. Cir. 2016) ("We agree with the parties that § 165 is subject to a 'frustration of public policy' doctrine."); *Hackworth v. Commissioner*, 155 F. App'x 627, 629–30 (4th Cir. 2005) (disallowing, on public policy grounds, a loss deduction under section 165 for forfeiture of illegal gambling proceeds), *aff'g* T.C. Memo. 2004-173, 88 T.C.M. (CCH) 44; *King v. United States*, 152 F.3d 1200, 1202 (9th Cir. 1998) (disallowing, on public policy grounds, a loss deduction under section 165 for forfeiture of illegal drug proceeds); *Stephens v. Commissioner*, 905 F.2d 667, 672 (2d Cir. 1990) ("The public policy exception to deductibility under Section 165 was not explicitly affected by the amendments to Section 162. . . . [W]e believe that the public policy considerations embodied in Section 162(f) are highly relevant in determining whether [a payment is] deductible under Section 165."), *rev'g and remanding* 93 T.C. 108 (1989); *Wood v. United States*, 863 F.2d 417, 420–22 (5th Cir. 1989) (disallowing, on public policy grounds, a loss deduction under section 165 for forfeiture of illegal drug proceeds); *Medeiros v. Commissioner*, 77 T.C. 1255, 1262 (1981) ("We . . . agree with [the Commissioner] that a deduction of the [trust fund recovery penalty under section 6672] as a loss under section

---

[10] There are certain exceptions, not relevant here, such as for restitution payments and the like. *See Stephens v. Commissioner*, 905 F.2d at 672–73 (holding that a restitution payment that is "more compensatory than punitive in nature" does not fall afoul of the public policy doctrine); *S. Pac. Transp. Co. v. Commissioner*, 75 T.C. 497, 652 (1980) (concluding that if a civil penalty is imposed "as a remedial measure to compensate another party for expenses incurred as a result of the violation," the deduction of the penalty is not barred by section 162(f)), *supplemented by* 82 T.C. 122 (1984).

[11] We note that Mr. Hampton has not contended that HCM may take a deduction under section 162 on account of the asset seizures. *Cf. Holmes Enters., Inc. v. Commissioner*, 69 T.C. 114, 116 (1977) (collecting cases) ("We do not consider the forfeiture of property, albeit business property, to be an ordinary and necessary business expense. Rather, it is a loss." (Citations omitted.)).

**[\*11]** 165(c)(1) is not allowable because to allow it would frustrate public policy."); *Sestak v. Commissioner*, T.C. Memo. 2022-41, at \*9–10 (disallowing, on public policy grounds, a deduction for a loss on the sale of real estate bought with bribery proceeds and sold pursuant to an agreement with the United States to forfeit the sale proceeds); *Bailey v. Commissioner*, T.C. Memo. 1989-674, 58 T.C.M. (CCH) 1030, 1033 ("It is clear that there is a clearly defined public policy in the United States against trafficking in narcotics and, where a forfeiture of assets occurs as the result of such drug dealing, a deduction under section 165 with respect thereto is not allowable to the taxpayer."), *aff'd per curiam*, 929 F.2d 700 (6th Cir. 1991) (unpublished table decision).

Courts have uniformly held that forfeitures in connection with a criminal conviction are precisely the sorts of penalties for which the Supreme Court held, in *Tank Truck Rentals, Inc. v. Commissioner*, 356 U.S. at 35–36, that a deduction would frustrate public policy by reducing the "sting" of the penalty. *See, e.g.*, *Nacchio*, 824 F.3d at 1377–81; *Hackworth v. Commissioner*, 155 F. App'x at 632; *King*, 152 F.3d at 1202; *Wood*, 863 F.2d at 420–22; *Sestak*, T.C. Memo. 2022-41, at \*11–12; *Bailey*, 58 T.C.M. (CCH) at 1033. Indeed, the Supreme Court has characterized criminal forfeiture as "an aspect of *punishment* imposed following conviction of a substantive criminal offense." *Libretti v. United States*, 516 U.S. 29, 39 (1995) (emphasis added).[12]

Mr. Hampton maintains that the public policy doctrine has no application to this case, primarily because HCM was never indicted or charged with wrongdoing. Mr. Hampton argues that because the doctrine did not prohibit HCM from claiming a 2016 loss on account of the asset seizures, then he was entitled to claim that same loss in his

---

[12] We note that 18 U.S.C. § 981, the statute under which Mr. Hampton's and HCM's bank accounts were forfeited, is titled "Civil forfeiture" (in contrast to 18 U.S.C. § 982, which is titled "Criminal forfeiture"). However, 18 U.S.C. § 981(a)(1)(C) (the operative provision for Mr. Hampton and HCM) refers to "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [various *criminal* statutes] . . . or a conspiracy to commit such offense." *Cf. Murillo v. Commissioner*, 166 F.3d 1201 (2d Cir. 1998) (unpublished table decision) ("The dispositive question is whether this § 981 forfeiture is a 'fine or similar penalty' under § 162(f). We hold that it is."), *aff'g* T.C. Memo. 1998-13. In an analogous context, the U.S. Court of Appeals for the Fifth Circuit held that for purposes of applying the public policy doctrine to forfeited proceeds of illegal drug sales: "The distinction between the 'civil' or 'criminal' character of forfeiture is irrelevant here. Forfeiture cannot seriously be considered anything other than an economic penalty for drug trafficking." *Wood*, 863 F.2d at 421 (footnote omitted). (The relevant forfeiture provision at issue in *Wood* was 21 U.S.C. § 881, which is titled simply "Forfeitures.")

**[\*12]** capacity as HCM's sole shareholder. *See* I.R.C. § 1366(a) (providing that an S corporation shareholder shall take into account his pro rata share of, among other things, the corporation's loss for the tax year).[13]

Even if we assume that HCM was entitled to claim a deduction for the asset seizures (a question we need not decide here), Mr. Hampton is barred by the public policy doctrine from reporting his 100% passthrough share of HCM's resulting loss. To hold otherwise would be to frustrate the sharply defined policy against conspiring to commit offenses against the United States (including federal program bribery, honest services fraud, and money laundering), as reflected in 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 666 (federal program bribery), 18 U.S.C. §§ 1343 and 1346 (honest services fraud), and 18 U.S.C. § 1956 (money laundering). Mr. Hampton was the wrongdoer, and HCM's assets were seized as part of the penalty for his wrongdoing. The seized and forfeited assets were clearly "property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the violations in Count One of the Information." Allowing him a deduction on account of HCM's loss would unquestionably reduce the "sting" of the penalty for him. *See Tank Truck Rentals, Inc. v. Commissioner*, 356 U.S. at 35–36. Allowing Mr. Hampton to deduct a loss by simply interposing HCM between him and (some of) the seized assets that came from the problematic "assigned" commissions would violate the public policy doctrine as formulated by the Supreme Court.

Indeed, the public policy doctrine is not so rigid or formulaic that it may apply only when the convicted person himself hands over a fine or penalty. For instance, in *Holmes Enterprises, Inc.*, 69 T.C. at 115, a corporation claimed a deduction for the criminal forfeiture of a car that it owned. The car was seized after the corporation's sole owner and president was convicted on illegal drug charges. (He was arrested while using the car to transport marijuana.) We concluded that although the corporation was a "separate, taxable entity, distinct from its employee," the public policy doctrine forbade it from claiming a deduction because it was not a "wholly innocent bystander." *Id.* at 117. Rather, because of

---

[13] Petitioner likewise argues that the public policy doctrine involves section 165 and does not reach a deduction claimed under section 1366. We reject that argument as it is directly contrary to the provisions of section 1366(b), which provides that the character of an S corporation's items of income and loss that pass through to a shareholder "shall be determined as if such item were realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corporation."

**[*13]** the convicted person's role as the corporation's sole owner and president, the corporation "knew of and fully consented to the illegal use of its automobile." *Id.* Likewise, here, the fact that HCM was never charged or convicted does not entail that the public policy doctrine cannot apply in connection with the criminal forfeiture of HCM's ill-begotten assets.

Mr. Hampton asserts that because the public policy doctrine is an equitable doctrine, we should take into consideration the fact (or so he claims) that the United States' seizure of HCM's assets violated due process and (given that HCM was not the wrongdoer) was otherwise "over-zealous." However, we see no legal impropriety in the United States' seizure of HCM's assets to satisfy Mr. Hampton's forfeiture liability. The U.S. Court of Appeals for the Sixth Circuit, to which an appeal of this case would lie absent a contrary stipulation by the parties, *see* I.R.C. § 7482(b)(1)(A), (2), recently was asked to rule whether a corporation wholly owned by an individual convicted of a criminal conspiracy was a person "other than the defendant" for purposes of 21 U.S.C. § 853(n)(2), which allows certain persons who assert a legal interest in property subject to forfeiture to petition the court for a hearing, *United States v. Parenteau*, 647 F. App'x 593, 594–95 (6th Cir. 2016). The Sixth Circuit held that the corporation was not a person "other than the defendant," citing as relevant factors that the defendant wholly owned and controlled the corporation, that the corporation did not introduce corporate records or otherwise provide evidence of following corporate formalities, and that the defendant used the property subject to forfeiture (viz, insurance policies titularly owned by the corporation) in his criminal scheme. *Id.* at 596–98.

By analogy to the Sixth Circuit's reasoning, we conclude that HCM is not a separate person from Mr. Hampton for purposes of the substitute forfeiture provisions of 21 U.S.C. § 853(p), which under certain circumstances authorize a court to order forfeiture of "any other property *of the defendant*" (emphasis added) if the property involved in or obtained from the defendant's criminal offense is unavailable. Like the defendant in *Parenteau*, Mr. Hampton wholly owned and controlled the corporation, HCM, and he offered only minimal evidence that corporate formalities were followed.[14] More importantly as previously

---

[14] Mr. Hampton introduced into evidence HCM's pro forma Articles of Incorporation, HCM's reregistration of its trade name in 2013, and HCM's receipt of an Employer Identification Number from the Internal Revenue Service. The record contains no bylaws, minutes of board meetings (or other evidence that any such meetings occurred), contracts signed by HCM, or accounting books and records.

**[\*14]** noted, over the years HCM's sole source of business income was the commissions generated by Mr. Hampton that were "assigned" to HCM. It was those "assigned" commissions that led to the criminal indictment, plea, and forfeiture at issue in this case. It is impossible to see how HCM was independent of Mr. Hampton such that the forfeiture loss deduction should be allowed. Therefore, the United States' seizure of HCM's bank accounts was authorized under 21 U.S.C. § 853(p).

Next, we disagree with Mr. Hampton's argument that we need to decide whether the public policy doctrine's application is affected by illegality or over-zealousness on the United States' part in seizing the assets and creating the forfeiture as those arguments should have been pursued when the United States seized the property. Both the U.S. Court of Appeals for the Fourth Circuit and this Court have previously indicated that the illegality of a criminal forfeiture need not prevent the public policy doctrine from disallowing a deduction for the forfeited property. *See Hackworth v. Commissioner*, 155 F. App'x at 632 ("If the taxpayers believe that the forfeiture was invalid, the proper remedy is for them to sue the [relevant government unit] and seek return of the funds [rather than claim a tax deduction]."); *Hackworth*, 88 T.C.M. (CCH) at 46 ("This Court lacks jurisdiction over [the taxpayers'] collateral attack on the forfeiture.").

Finally, because the public policy doctrine disallows Mr. Hampton's claimed deduction, we need not address the Commissioner's alternative arguments (namely, that Mr. Hampton did not have a sufficient basis in his HCM shares to claim the deduction, that HCM was a sham entity that should be disregarded for tax purposes, and that the asset seizures effectively constituted a distribution or compensation payment from HCM to Mr. Hampton).

We have considered all arguments made by the parties and, to the extent not addressed herein, we consider them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*